# APPEAL  NO. 14-4695

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA,**

Appellee,

v.

**KENNETH RUSH**

Appellant.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

## BRIEF OF APPELLANT KENNETH RUSH

**CHRISTIAN M. CAPECE**
**FEDERAL PUBLIC DEFENDER**

**JONATHAN D. BYRNE**
**APPELLATE COUNSEL**

**RHETT H. JOHNSON**
**ASSISTANT FEDERAL PUBLIC DEFENDER**

U. S. Courthouse, Room 3400
300 Virginia Street East
Charleston, West Virginia  25301
Telephone: 304/347-3350

**Counsel for Appellant**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i - iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 - 8

> A. Six officers search the apartment where Rush is staying, falsely claiming to have a search warrant.
>
> B. Rush moves to suppress the evidence found during the search.
>
> C. The district court concludes that the officers violated the Fourth Amendment, but that suppression of the evidence is not appropriate.
>
> D. Rush pleads guilty, preserving his right to appeal the district court's suppression decision.

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9 - 29

> Evidence discovered during a search in which an officer lied to Rush that the officers were acting pursuant to a search warrant should have been suppressed because the officers were not acting in good faith.
>
> A. Standard of Review.
>
> B. The evidence seized during the search of the apartment where Rush was staying should have been suppressed because the officers were not acting in good faith.
>
> C. Evidence seized in violation of the Fourth Amendment should be excluded when doing so would

deter future unconstitutional conduct and the societal costs of suppression would not outweigh that deterrence.

D.    This case is unlike those where the Supreme Court or this Court have concluded that exclusion is not appropriate.

E.    There is great deterrent value in suppressing evidence in this case to discourage future officers from lying during the execution of searches.

F.    The cost of exclusion is not great in this case because the officers can still act on the information provided by Rush.

G.    Courts, including this one, dealing with similar cases have found exclusion to be appropriate when officers mislead citizens.

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## <u>Supreme Court Cases</u>

*Arizona v. Gant,* 556 U.S. 332 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bryan v. United States*, 524 U.S. 184, 193, 196 (1998) . . . . . . . . . . . . . . . . . . . . . . . 17

*Bumper v. North Carolina*, 391 U.S. 543 (1968) . . . . . . . . . . . . 6, 7, 15, 16, 17, 18, 26, 28

*Davis v. United States*, ___ U.S. ___, 131 S.Ct. 2419,
        2427 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 13, 15, 18, 24

*Georgia v. Randolph*, 547 U.S. 103 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 15

*Herring v. United States*, 555 U.S. 135 (2009) . . . . . . . . . . . . 10, 11, 12, 13, 14, 21, 27, 29

*Mapp v. Ohio*, 367 U.S. 643, 659 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Massachusetts v. Painten*, 389 U.S. 560, 565, (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Michigan v. Summers*, 452 U.S. 692, 702-703 (1981) . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*New York v. Belton*, 453 U.S. 454 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Jones*, ___ U.S. ___, 132 S.Ct. 945 (2012) . . . . . . . . . . . . . . . . . . . 13, 17

*United States v. Knotts*, 460 U.S. 276 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 21

*Whren v. United States*, 517 U.S. 806, 813 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## <u>Federal Court Cases</u>

*Trull v. Smolka*, 411 Fed.Appx. 651 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Trulock v. Freeh*, 275 F.3d 391 401-402 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) . . . . . . . . . . . . . 17

*United States v. Davis*, 690 F.3d 226, 234, 256 (4th Cir. 2012) . . . . . . . . . 7, 9, 12, 13, 14

*United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Harrison*, 639 F.3d 1273, 1281 (10th Cir. 2011) . . . . . . . . . . . . . . . . 19, 27

*United States v. Harvey*, 901 F.Supp. 2d 681, 696 (N.D. W.Va. 2012) . . . . . . . . . . . . . 27

*United States v. Howard*, 309 Fed.Appx. 760 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Parson*, 599 F.Supp.2d 592 (W.D. Penn. 2009) . . . . . . . . . . . . . . . 19, 26

*United States v. Retolaza*,  398 F.2d 235, 242 (4th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Saafir*, 754 F.3d 262 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Shaw*, 707 F.3d 666 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . 19, 25, 26

*United States v. Shrader*, 675 F.3d 300 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Smith*, 395 F.3d 516, 518-19 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . 13, 15, 17

*United States v. Stokely*, 733 F.Supp.2d 868 (E.D. Tenn. 2010) . . . . . . . . . . . . . . . . . . . 27

*United States v. Yengel*, 711 F.3d 392 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Yale v. National Indem. Co.*, 602 F.2d 642, 645 (4th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 29

## **State Court Cases**

*People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*State v. McClead*, 566 S.E.2d 652, 656 (W.Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State v. Stone*, 728 S.E.2d 155 (W.Va. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Statutes

18 U.S.C. §3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. §841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Other Authorities and Sources

Federal Rule of Appellate Procedure Rule 34(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.S. Const., Amend IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

Mark Hutchins, "Executing Search Warrants," *Point of View*, at 1 (Fall 2013) . . . . . . 21

*Chief's Office Staff*, http://www.charlestonwvpolice.org/Pages/Chief%20Ofc.htm
        (last visited November 17, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Durham cops lied about 911 calls*, Indy Week (July 9, 2014), http://www.indyweek.com/
indyweek/durham-cops-lied-about-911-calls/Content?oid=4201004
        (last visited November 18, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

http://le.alcoda.org/publications/point_of_view/files/F13_Executing_SW.pdf
        (last visited November 19, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## STATEMENT OF JURISDICTION

On May 19, 2013, an indictment was filed in the Southern District of West Virginia charging Kenneth Rush ("Rush") with possession with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. §841(a)(1).  J.A. 8.  Rush eventually pleaded guilty to an information charging him with possession with intent to distribute an unspecified amount of crack cocaine, also in violation of 21 U.S.C. §841(a)(1).  J.A. 150.  Because those charges constitute offenses against the United States, the district court had original jurisdiction pursuant to 18 U.S.C. §3231.  This is an appeal from the final judgment and sentence imposed after Rush pleaded guilty to the information.  J.A. 165-168.  A judgment order was entered on September 2, 2014. J.A. 169-175.  Rush timely filed a notice of appeal on September 3, 2014.  J.A. 176. The United States Court of Appeals for the Fourth Circuit has jurisdiction pursuant to 18 U.S.C. §3742 and 28 U.S.C. §1291.

## ISSUE FOR REVIEW

Whether evidence discovered during a search in which an officer lied to Rush that the officers were acting pursuant to a search warrant should have been suppressed because the officers were not acting in good faith.

## STATEMENT OF CASE

This case arises from the search of an apartment where Rush was staying. Although officers had consent to search the apartment from its regular occupant,

their actions prevented Rush – the sole present co-occupant – from exercising his right to revoke that consent. As a result, the officers discovered evidence that formed the basis of the indictment and information filed against Rush. The district court found that the officers violated the Fourth Amendment, but declined to suppress that evidence.

### A. Six officers search the apartment where Rush is staying, falsely claiming to have a search warrant.

On May 23, 2013, Marquita Wills ("Wills") called the Metropolitan Drug Enforcement Network Team ("MDENT"), a Charleston, West Virginia based drug task force, to report that Rush was selling drugs (she suspected cocaine) from her apartment where Rush had spent the previous night. She wanted Rush out of her apartment, although she did not say she had asked him to leave. J.A. 132-133. Wills spoke to Lieutenant A.C. Napier ("Napier"), an officer with 18 years' experience, including seven years' experience particularly with MDENT. J.A. 27-28, 132.

Wills met with Napier at a local casino where she worked. J.A. 29. She signed a consent to search form and provided Napier with a key to her apartment. J.A. 133. Wills did not go with Napier to her apartment because she was working. J.A. 41. Napier gathered several other officers to execute the search of Wills's apartment, each with significant experience, including Sergeant William Winkler (18 years, four with MDENT), Detective Keven Allen (seven years, five with MDENT), and Detective

Ryan Higginbotham (eight years, three with MDENT). J.A. 59, 77-78, 91, 133. A total of six officers went to the apartment. J.A. 32.

The officers arrived at Wills's apartment at approximately 10:00 in the morning, at which time "the front door was opened, without knocking, with the key." J.A. 133. The officers entered with weapons drawn and yelled, "Police!" *Ibid.* They expected to find Rush in the apartment. *Ibid.* They found him asleep in the master bedroom. Two officers "had him get out of bed, handcuffed him in front and escorted him to the couch in the living room." J.A. 134. At that point, Rush asked, "what's going on? Why you all here?" *Ibid.* Winkler answered, falsely, "we have a search warrant." *Ibid.*

A subsequent search of the apartment, some of which was conducted with Rush's assistance, uncovered crack cocaine. J.A. 134-135. Rush also told Napier about his supplier, how much he paid for the drugs, and how about half of it "was fake." J.A. 135. Rush also gave officers permission to search his vehicle, parked out front, but nothing was found there. "After the search of the vehicle, the officers left, leaving Mr. Rush in the apartment." J.A. 136. Based on what was found in the apartment, Rush was charged with possessing with intent to distribute 28 grams or more of crack cocaine. J.A. 8. Rush was arrested and released on bond. J.A. 2.

### B.    Rush moves to suppress the evidence found during the search.

Rush filed a motion to suppress the evidence found during the search of the apartment. J.A. 9-13. He argued that, under *Georgia v. Randolph*, 547 U.S. 103 (2006),

he had a right to object to a search of the apartment, even if Wills had already given consent. J.A. 10-11. The Government argued that Rush's motion should fail because he did not challenge the officers during the search or otherwise object to their actions. J.A. 16-17.

A hearing on Rush's motion was held on January 7, 2014. J.A. 22-131. The Government presented testimony about the search from Napier, Winkler, Allen, and Higginbotham. J.A. 27-97.

Napier testified that the officers told Rush that, "obviously, we were there to search the apartment." J.A. 33. He also testified that while one of the other officers "may have said direct" that they had a search warrant, he "believe[d] it was more insinuated." *Ibid.* Napier later explained that one makes such an insinuation by "your conduct really," including not knocking on the door, saying "Police," and getting Rush out of bed, at which point "it was kind of a[n] obvious insinuation I think for him." J.A. 43.[1] Napier confirmed that, "I know my actions insinuated it." J.A. 44. He also agreed that "considerable power comes with saying you have a search warrant." J.A. 53. Napier also testified that they "just didn't want him to know it was Ms. Wills telling, for her safety." J.A. 55.

Rush did not "attempt in any way to refuse consent to search." J.A. 34. After Rush developed a rapport with Allen, he "said he wanted to cooperate and show us

---

[1] Allen later testified that one does not ask permission before placing a person in handcuffs. J.A. 84.

where all the drugs were at." J.A. 36.  However, Napier conceded that, if someone had told Rush they had a search warrant, had he objected or tried to stop the search he could be arrested for obstruction.  J.A. 53.  Rush was not arrested and once the search was over, Napier testified that "we left, and left him there at the apartment." J.A. 41.

Winkler testified that "I don't remember whether I specifically said we had a warrant . . . whether I had a dialogue with him or not." J.A. 62.  However, he later admitted that his police report was more definite on the issue and agreed "that someone explained to him, we have a search warrant for the apartment." J.A. 67.  He testified that he was "probably" the one who told Rush there was a search warrant and did so after Rush asked what the officers were doing.  J.A. 71, 72.  He also testified about the plan formulated for the search, but did not know whether falsely telling Rush there was a search warrant was part of that plan.  However, "what we wanted to do was protect her" and "I was wanting to protect the resident who had given us consent to come there." J.A. 70, 75.

Rush also testified at the hearing.  J.A. 104-115.  He explained how when he was taken to the living room he was immediately questioned about where drugs were.  When he asked "do you guys have a warrant?" he was told "we have a warrant, don't worry about the warrant." J.A. 108.

**C.**    **The district court concludes that the officers violated the Fourth Amendment, but that suppression of the evidence is not appropriate.**

5

On March 13, 2014, the district court issued a memorandum opinion and order in which it denied Rush's motion to suppress. J.A. 132-149. The district court concluded that the officers had violated the Fourth Amendment, but that ultimately suppression was not appropriate. J.A. 148

On the lawfulness of the search itself, the district court concluded that under a long line of precedent the form signed by Wills "provided lawful consent to search" that "was effective at least until law enforcement claimed that it had a warrant that, in actuality, did not exist." J.A. 138. When that claim was made "the circumstances changed based upon the synergistic effect of two Supreme Court decisions," *Georgia v. Randolph*, 547 U.S. 103 (2006), and *Bumper v. North Carolina*, 391 U.S. 543 (1968). J.A. 138, 139. The district court concluded that the officers "materially impaired Mr. Rush's right, under *Randolph*, to object when law enforcement entered the home." J.A. 139. The scenario was rife with coercion that "effectively sealed Mr. Rush's lips closed when he might have otherwise objected." *Ibid.* Thus, "the search became unlawful upon the incorrect claim that a warrant had issued." J.A. 140-141.

On whether suppression was appropriate, the court began by surveying recent decisions from the Supreme Court and this Court which emphasized that the exclusionary rule "is focused on deterrence, namely, preventing future Fourth Amendment violations." J.A. 142. Exclusion should be saved for "situations where law enforcement actions are "patently unconstitutional' . . . [on the order of] brazen or

reckless.'" J.A. 145, quoting *United States v. Davis*, 690 F.3d 226, 256 (4th Cir. 2012). If there is "little to suggest a pattern of constitutional wrongdoing and little likelihood of future recurrences, the deterrent capacity of the exclusionary rule is diminished." *Ibid.*

That was the situation in this case, the district court concluded. It noted that "one could only speculate concerning whether [Rush] would have exercised his rights under *Randolph*" and that "[w]hile the intersection of *Bumper* and *Randolph* comes into sharp focus upon reflection and study, it would have been less than apparent to the officers confronting the circumstances as they unfolded." J.A. 146-147. The district court concluded that the officers "did not inaccurately inform Mr. Rush about the warrant in order to impair his ability to object," instead doing so "in a justifiable effort to protect Ms. Wills." J.A. 147. This was not part of a "pattern of constitutional wrongdoing" and there was "a vanishingly low likelihood of future recurrences." *Ibid.* The officers did not act "deliberately, recklessly, or with gross negligence." *Ibid.* As a result, the "deterrent capacity of the exclusionary rule in this instance is thus substantially diminished if not altogether absent." *Ibid.*

### D.    Rush pleads guilty, preserving his right to appeal the district court's suppression decision.

Following the denial of his motion to suppress, Rush made an agreement with the Government to resolve the charge against him. J.A. 152-158. He agreed to plead guilty to an information charging him with possessing with the intent to distribute an unspecified amount of crack cocaine. J.A. 152. The agreement allowed for him to

preserve for appeal the issue of whether the evidence seized during the search should have been suppressed.  J.A. 153.  As a result of district filing practices, the filing of the information created a second case against Rush.  J.A. 5.  The parties and the district court later agreed in a stipulation and order that the two cases, the indictment and the information, were the same proceeding and Rush's right to appeal the suppression decision had been preserved.  J.A. 162-164.  Rush pleaded guilty on April 1, 2014.  J.A. 165-168.  He was later sentenced to 12 days and one month in prison, followed by a three-year term of supervised release.  J.A. 170-171.  The district court granted Rush's motion to allow him to remain on bond pending this appeal.  J.A. 175.

**SUMMARY OF ARGUMENT**

It is appropriate to suppress evidence that was discovered based on a violation of the Fourth Amendment when that violation was the result of intentional and deliberate conduct of the kind that could be deterred in the future.  The evidence in this case, discovered following such a violation, should have been suppressed.  The officers' conduct in this case was unlike the behavior of officers in cases where exclusion was rejected because their behavior was merely negligent or in accordance with binding precedent at the time of the search.  Suppressing the evidence found in this case would deter future similar violations and would not come at a great cost to society.  For that reason, other courts faced with similar violations have concluded that exclusion is appropriate.  The district court erred by concluding otherwise.  This Court should reverse the district court's decision denying Rush's motion to suppress.

# ARGUMENT

**Evidence discovered during a search in which an officer lied to Rush that the officers were acting pursuant to a search warrant should have been suppressed because the officers were not acting in good faith.**

### A.    Standard of Review.

This Court "review[s] the factual findings underlying a motion to suppress for clear error and the district court's legal determinations *de novo*." *United States v. Davis*, 690 F.3d 226, 234 (4th Cir. 2012).

### B.    The evidence seized during the search of the apartment where Rush was staying should have been suppressed because the officers were not acting in good faith.

The district court correctly concluded that "law enforcement claimed that it had a warrant that, in actuality, did not exist," which was an "inaccurate claim of authority." J.A. 138. In plainer terms, at least one officer who searched the apartment where Rush was staying lied to him about having a search warrant to authorize that search. The district court was also correct that this falsehood "materially impaired Mr. Rush's right . . . to object when law enforcement entered the home" in violation of the Fourth Amendment. J.A. 140, 141. Where the district court erred was in concluding that the officers' misconduct did not require the suppression of the evidence they found. J.A. 146-148. The officers' lie to Rush that there was a search warrant is precisely the kind of deliberate and reckless violation

that suppression would deter, as other courts faced with similar situations have concluded.

**C. Evidence seized in violation of the Fourth Amendment should be excluded when doing so would deter future unconstitutional conduct and the societal costs of suppression would not outweigh that deterrence.**

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court recognized a "good faith" exception to the exclusionary rule for certain Fourth Amendment violations. It did so by focusing on the deterrent value of exclusion on future behavior of law enforcement officers. *Id.* at 918-919. In spite of *Leon*, which dealt with a situation where officers acted based on a search warrant later deemed invalid, future decisions of the Court "were not nearly so discriminating in their approach to the doctrine." *Davis v. United States*, ___ U.S. ___, 131 S.Ct. 2419, 2427 (2011). As a result, "several decisions . . . suggested that the [exclusionary] rule was a self-executing mandate implicit in the Fourth Amendment itself." *Ibid.*

The Supreme Court clarified the operation of the exclusionary rule beginning in *Herring v. United States*, 555 U.S. 135 (2009). Herring had been arrested on an outstanding warrant when he came to the police station to get something from his impounded vehicle. At the time of his arrest, he was found in possession of a firearm and drugs. Shortly after his arrest, however, administrators determined that the warrant upon which Herring had been arrested was no longer active, but had not yet

been purged from the county computer system.  Herring moved to suppress the evidence found as a result of his arrest.  *Id.* at 137-139.

The Supreme Court concluded that the evidence found as a result of the search – which all parties agreed was not supported by probable cause and thus violated the Fourth Amendment – did not need to be suppressed.  *Herring*, 555 U.S. at 147-148. In doing so, the Court noted that the exclusionary rule is not always appropriate and that "this judicially created rule is designed to safeguard Fourth Amendment rights generally through its deterrence effect."  *Id.* at 139-140 (internal quotation marks omitted).  It also noted that the lower court "concluded that this error was negligent" and "[t]hat fact is crucial to our holding that this error is not enough by itself to require 'the extreme sanction of exclusion.'"  *Id.* at 140, quoting *Leon*, 468 U.S. at 916. That is because exclusion is not "a necessary consequence of a Fourth Amendment violation."  *Id.* at 141.  It is only appropriate when it will have a deterrent effect on future behavior and where the benefits of exclusion outweigh the costs.  *Id.* at 140-144.  The conduct at issue "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id.* at 144.  Because the officers in Herring's case did not engage in such conduct – the Fourth Amendment violation was the result of negligence – exclusion was not appropriate.  *Id.* at 147.

The Supreme Court further refined its good faith analysis in *Davis v. United States*, ___ U.S. ___, 131 S.Ct. 2419 (2011).  Davis was searched following the stop of

a car in which he was riding. At the time, the search was done in accordance with binding Eleventh Circuit precedent interpreting *New York v. Belton*, 453 U.S. 454 (1981). While Davis's case was pending, the Court decided a case which upended that understanding of *Belton*, making the search a violation of the Fourth Amendment.[2] *Id.* at 2424-2426. Thus, the issue in *Davis* was whether exclusion was appropriate "when the police conduct a search in compliance with binding precedent that is later overruled." *Id.* at 2423.

The Court concluded that it was not. *Davis*, 131 S.Ct. at 2423-2424. In doing so, the Court reaffirmed that exclusion was a "bitter pill" that "society must swallow . . . when necessary," but only where "the deterrence benefits of suppression outweigh its heavy costs." *Id.* at 2427. In *Davis*, where "all agree that the officers' conduct was in strict compliance with binding Circuit law and was not culpable in any way," that "acknowledged absence of police culpability dooms Davis's claim." *Id.* at 2428.

This Court has applied the *Herring/Davis* analysis twice in recent years to conclude that exclusion of evidence seized in violation of the Fourth Amendment was not appropriate. In *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), this Court affirmed a refusal to suppress evidence found during the extraction of DNA from clothing seized from the defendant when he had earlier been the victim of a crime. Examining the actions of the technicians that collected the DNA, rather than the

---

[2] See, *Arizona v. Gant*, 556 U.S. 332 (2009).

officer who initially seized the clothing, this Court concluded that their conduct was "simply not the type of 'flagrant,' or 'intentional . . . patently unconstitutional' conduct that warrants the application of the exclusionary rule." *Id.* at 253, quoting *Herring*, 555 U.S. at 143-144. Their actions "were, at best, 'isolated negligence attenuated from the arrest.'" *Id.* at 256, quoting *Herring*, 555 U.S. at 137. More recently, in *United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014), this Court affirmed a district court's decision not to exclude evidence obtained using a GPS tracker attached to the defendant's vehicle without a warrant, in violation of later Supreme Court precedent,[3] because there was "no contrary guidance from the Supreme Court or this Court" at the time of the search. *Id.* at 338.

### D. This case is unlike those where the Supreme Court or this Court have concluded that exclusion is not appropriate.

Although "the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court," *Stephens*, 764 F.3d at 336, the cases in which the Supreme Court and this Court have concluded exclusion is not appropriate provide crucial guidance. This case bears few of the hallmarks of those cases discussed above. The distinctions between this case and those discussed above show that exclusion was appropriate in this case.

Both the Supreme Court's decision in *Herring* and this Court's decision in *Davis* turned on the fact that the relevant officers' actions were the result of negligence,

---

[3] See, *United States v. Jones*, ___ U.S. ___, 132 S.Ct. 945 (2012).

13

rather than intentional wrongdoing.  See, *Herring*, 555 U.S. at 698 (calling the actions "a negligent bookkeeping error" and concluding "the error was the result of isolated negligence"); *Davis*, 690 F.3d at 253 (concluding that "the unique facts of this case reflect, at most, isolated negligence").  By contrast, the officers' actions in this case were deliberate and culpable.

Napier went to the casino to speak with Wills, who provided him with a signed consent to search form and the key to her apartment.  J.A. 29, 133.  He assembled a team of highly experienced officers – with at least[4] 20 years combined experience with MDENT specifically and nearly five decades of general law enforcement experience – to go to the apartment.  J.A. 27-28, 59, 77-78, 91, 133.  There was a plan formulated ahead of the officers' arrival at the apartment.  J.A. 70.  Most importantly, Winkler, the commander of the Charleston Police Department's Professional Standards Division, made the choice to lie to Rush and say they had a warrant to search the apartment.  J.A. 60, 67, 71, 72.[5]  There was no suggestion that Winkler was confused or misinformed about the presence of a warrant, as in *Herring*.  He made a choice to lie to Rush while conducting the search.  That is the kind of "flagrant," "intentional," and "patently unconstitutional" conduct that makes exclusion appropriate.

---

[4] Only four of the six officers testified.  The experience levels of the other two are unknown.

[5] See also, *Chief's Office Staff*, http://www.charlestonwvpolice.org/Pages/Chief%20Ofc.htm (last visited November 17, 2014).

Nor was that conduct in accordance with binding precedent at the time of the search, as in the Supreme Court's decision in *Davis* and this Court's decision in *Stephens*. *Davis*, 131 S.Ct. at 2428 ("all agree that the officers' conduct was in strict compliance with then-binding Circuit law"); *Stephens*, 764 F.3d at 338 ("a reasonably well-trained officer in this Circuit could have relied on *Knotts* as permitting the type of warrantless GPS usage in this case"). By contrast, the officers' conduct in this case ran afoul of biding precedent from the United States and West Virginia Supreme Courts.

The district court identified the convergence of two Supreme Court cases as controlling its conclusion that the officers violated the Fourth Amendment. J.A. 138, 139. *Georgia v. Randolph*, 547 U.S. 103 (2006), although of relatively recent vintage, was announced seven years before the search in this case. It was no longer novel and had been applied by this Court numerous times. See, e.g., *United States v. Shrader*, 675 F.3d 300 (4th Cir. 2012); *Trull v. Smolka*, 411 Fed.Appx. 651 (4th Cir. 2011); *United States v. Howard*, 309 Fed.Appx. 760 (4th Cir. 2009). Each of the officers who testified at Rush's suppression hearing had spent years, specifically with MDENT, during which they must have been aware of *Randolph's* holding.

More fundamental to the district court's conclusion was *Bumper v. North Carolina,* 391 U.S. 543 (1968). In *Bumper*, police obtained consent to search the defendant's home, where he lived with his grandmother, when an officer "walked up and said 'I have a search warrant to your house,'" after which the grandmother

"walked out and told them to come in." *Id.* at 546. However, there was no warrant. The Court held that "there can be no consent under such circumstances." *Id.* at 548. That is because "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Id.* at 550. Indeed, as Napier conceded, if someone tried to interfere with a search being conducted pursuant to a warrant he would be arrested for obstruction. J.A. 53. Such a situation, the Court concluded "is instinct with coercion" where "there cannot be consent." *Bumper*, 391 U.S. at 550.

Bumper was decided 46 years ago. It has been the law, plainly stated and clear, for Winkler's entire career. It has been applied by both this Court and the West Virginia Supreme Court. See, e.g., *Trulock v. Freeh*, 275 F.3d 391 401-402 (4th Cir. 2001)(consent given by suspect told that FBI had a search warrant when it did not was invalid); *State v. McClead*, 566 S.E.2d 652, 656 (W.Va. 2002)(consent to blood test given by driver erroneously told arresting officer could compel such a test with a warrant was invalid).[6] Even given that vintage, this Court has recognized that *Bumper* "announced no new or novel constitutional rule." *United States v. Retolaza*, 398 F.2d 235, 242 (4th Cir. 1968)(*per curiam*, on petition for rehearing). Whatever clarity the district court suggested could only be found in hindsight was extant long before Rush came to Charleston to spend the night in Wills's apartment.

---

[6] In *State v. Stone*, 728 S.E.2d 155 (W.Va. 2012), the court concluded that state law did allow officers to seek a warrant in such situations.

This case presents something of a mirror image to *Stephens*. In that case, it was agreed that prior to *Jones* there was no definitive ruling from the Supreme Court or this Court that putting a GPS tracking device on a vehicle without a warrant violated the Fourth Amendment. *Stephens*, 764 F.3d at 338. The law suggested, at the very least, the opposite, as some courts had concluded. *Id.* at 331-334. Looking to *United States v. Knotts*, 460 U.S. 276 (1983), in which the Supreme Court approved the use of a "beeper" to track an illicit shipment, this Court concluded that although it was "not exactly on points with the facts of this case . . . it is the legal principle of *Knotts*, rather than the precise factual circumstances, that matters." *Id.* at 337-338.

The same analysis applies in this case. It is not important that neither *Bumper* nor *Randolph* involved "the precise factual circumstances" of this case. Rather, it is their "legal principle[s] . . . that matter." Those principles – that Rush as a present co-occupant had a right to object to and override Wills's consent to search the apartment and that police may not falsely claim to have a search warrant in order to gain consent to search – were well established by the time Winkler lied to Rush about having a search warrant. It is a fundamental maxim that "every citizen knows the law" and "ignorance of the law is no excuse." *Bryan v. United States*, 524 U.S. 184, 193, 196 (1998). It would be profoundly unjust to hold police officers to a lesser standard. See, *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003)(noting the "fundamental unfairness of holding citizens to 'the traditional rule that ignorance of

the law is no excuse,' while allowing those 'entrusted to enforce' the law to be
ignorant of it")(internal citations omitted).

### E. There is great deterrent value in suppressing evidence in this case to discourage future officers from lying during the execution of searches.

The main purpose of the exclusionary rule is deterrence of future Fourth
Amendment violations.  Thus, "[r]eal deterrent value is a necessary condition for
exclusion." *Davis*, 131 S.Ct. at 2427 (internal quotation omitted).  Ultimately, the
reason exclusion was not appropriate in the cases discussed above is because the
behavior of the officers was not sufficiently deliberate or intentional so as to be of the
kind that can be deterred.  The officers' actions in this case, by contrast, were
intentional and deliberate.  Furthermore, they ran afoul of clearly established Supreme
Court precedent.  This is precisely the situation in which exclusion is necessary.

When the officers entered Wills's apartment and rousted Rush from bed, he
asked "do you guys have a warrant?"  J.A. 108.  To this direct question seeking the
basis of the officers' authority for entering the home and placing Rush in handcuffs,
"someone explained to him, we have a search warrant for the apartment."  J.A. 67.
Winkler, the head of the department's Professional Standards Division, conceded he
was "probably" the one who made that statement, which the district court found to
be true.  J.A. 70, 71, 134.  However, there was no warrant.  The officers lied to Rush
about the presence of a warrant, a deliberate act that *Bumper* and its progeny make
clear violates the Fourth Amendment.  Intentional violation of the Fourth

Amendment requires exclusion, as "[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Mapp v. Ohio*, 367 U.S. 643, 659 (1961). Furthermore, as this Court has recognized, "the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone." *United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011).

In addition to the officers' conduct in this case being a deliberate and intentional violation of the Fourth Amendment, it is not an isolated incident of wrongdoing. Courts have repeatedly confronted cases where officers lied to someone in order to obtain consent to search a home. For example, in *United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011), officers suspected Harrison of having a cache of guns, but lacked probable cause to obtain a warrant. Instead, they did a "knock and talk," during which they falsely claimed that an anonymous tip had reported there was a bomb in Harrison's home. Harrison allowed them to enter, leading to the discovery of illicit firearms. *Id.* at 1275-1276. The court affirmed the district court's grant of Harrison's suppression motion, in which the district court noted "[t]his is precisely what the founders intended the Fourth Amendment to stop." *Id.* at 1277, 1281; see also, *United States v. Shaw*, 707 F.3d 666 (6th Cir. 2013)(reversing denial of suppression motion where officers lied to occupants of home about address of home to be searched pursuant to a warrant); *United States v. Parson*, 599 F.Supp.2d 592 (W.D. Penn. 2009)(granting suppression where officers lied to defendant that he had been

victim of identity theft to gain entry into his home).  Similar behavior can be found in news accounts as well, including one recent story about police lying to residents about fake 911 calls coming from their home as a means to gain consent to enter.  *Durham cops lied about 911 calls*, Indy Week (July 9, 2014), http://www.indyweek.com/indyweek/durham-cops-lied-about-911-calls/Content?oid=4201004 (last visited November 18, 2014).  Although the tactic was not an official policy, the police department nonetheless felt the need to officially ban the practice after it came to light during a suppression hearing.  In granting suppression, the judge noted that "[y]ou cannot enter someone's house based on a lie."  *Ibid.*

There is reason to suspect that the officers involved in this search have benefited from the acquiescence of lay persons faced with demonstrations of law enforcement authority.  While Napier would not concede that another officer told Rush there was a search warrant, he did believe "it was more insinuated."  J.A. 33.  As he explained, one insinuates the presence of a warrant by "your conduct really," which includes knocking on the door, yelling "Police!", and rousting someone from bed.  J.A. 43.  At that point, "it was kind of a[n] obvious insinuation I think for him."  *Ibid.*  Furthermore, as another officer admitted, no one asks a suspect's permission before he is put in handcuffs.  J.A. 84.  Although Napier claimed that such insinuation is "very unusual," the tactics used to communicate that insinuation appear to be common to the execution of searches.  J.A. 48; *Michigan v. Summers*, 452 U.S. 692, 702-

703 (1981)(during execution of search the "risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation"); Mark Hutchins, "Executing Search Warrants," *Point of View*, at 1 (Fall 2013)("[t]he execution of a warrant to search a home is, from start to finish, a frightening display of police power" and is "nothing less than the armed invasion into the sanctity of the home").[7]

In denying Rush's motion to suppress, the district court concluded that the officers did not lie about the presence of a search warrant "in order to impair his ability to object," but instead out of a "justifiable effort to protect Ms. Wills." J.A. 147. The district court's conclusion is incorrect for two reasons. First, it looks to the subjective motivations of the officers for their actions. This goes against the command that Fourth Amendment analysis concerns itself with objective, not subjective, facts. See, *Whren v. United States*, 517 U.S. 806, 813 (1996). The same is true for the analysis of whether exclusion is appropriate, as the "pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers." *Herring*, 555 U.S. at 145 (internal quotation marks omitted); see also, *Leon*, 468 U.S. at 923, fn. 23 ("we believe that 'sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless

---

[7] Available online at http://le.alcoda.org/publications/point_of_view/files/F13_Executing_SW.pdf (last visited November 19, 2014).

misallocation of judicial resources'"), quoting *Massachusetts v. Painten*, 389 U.S. 560, 565, (1968)(White, J., dissenting).

The second reason the district court's conclusion is incorrect is that the subjective reason given by the officers for lying about the presence of the search warrant does not match their own actions on the day of the search. Their motivation, according to multiple witnesses, was Wills's safety. Napier testified that they "just didn't want him to know it was Ms. Wills telling, for her safety." J.A. 55. Winkler, who told Rush there was a warrant, explained that "all we wanted to do was protect her" and that he was "wanting to protect the resident who had given us consent to come here." J.A. 108. However, when the search was over, the officers did not behave as if Rush was a threat to Wills. Rather than honor Wills's singular request to remove Rush from her apartment, the officers "left, leaving Mr. Rush in the apartment." J.A. 132-133, 136. The officers' actions, as opposed to their *ex post* justifications, could hardly be called "a justifiable effort to protect Ms. Wills."

This Court has rejected similar subjective justifications when they do not match the officers' behavior at the time of the search. In *United States v. Yengel*, 711 F.3d 392 (4th Cir. 2013), officers were called to a domestic disturbance. Once Yengel was arrested, his wife informed officers that Yengel had "a large number of firearms and a 'grenade' inside the house." *Id.* at 394. Yengel's wife led officers to an upstairs bedroom, in which there was a closet that contained the "grenade." The closet door was locked with a "combination keypad and thumbprint scanner" which she could

not open. *Id.* at 395. In a nearby bedroom, Yengel's young son was sleeping. At that time, the officer "still did not notify explosive experts, did not evacuate the house or nearby homes, did not remove the sleeping child . . . and did not secure a search warrant." *Ibid.* Nonetheless, an officer pried open the closet with a screwdriver. *Ibid.* Eventually, after the house was evacuated, an explosives team located "smokeless shotgun powder and a partially assembled explosive device," which led to Yengel being charged with possession of an unregistered firearm. *Id.* at 395-396. The district court granted Yengel's motion to suppress, concluding exigent circumstances did not justify the warrantless search of the closet. *Id.* at 396.

On appeal, this Court affirmed. In doing so, this Court noted that an officer operating under exigent circumstances needed an "objectively reasonable belief" that "must be based on specific articulable facts and reasonable inferences that have been drawn therefrom." *Yengel*, 711 F.3d at 397. Using that objective analysis, this Court rejected the Government's argument that "the possible threat of a grenade created exigent circumstances" which "justified the search of Yengel's closet as 'preventive action.'" *Ibid.* Instead, the "objective circumstances discernible" at the time of the search did not demonstrate such an exigency existed, particularly because the officer's "own actions belie the Government's argument." *Id.* at 398. The failure to evacuate the house, including the sleeping child, "provide stark evidence that a reasonable police officer would not – and did not – believe an exigency was ongoing." *Id.* at 399.

The officers' explanation for lying about the presence of a search warrant in this case is unpersuasive for the same reason the exigent circumstances argument failed in *Yengel* – their conduct did not match their asserted motivation. This Court should reach the same result and conclude that the officers did not have a legitimate reason to lie to Rush about the presence of a search warrant.

### F. The cost of exclusion is not great in this case because the officers can still act on the information provided by Rush.

Exclusion is only appropriate where "the deterrence benefits of suppression . . . outweigh its heavy costs." *Davis*, 131 S.Ct. at 2427. That cost is most often expressed in the axiom that the "criminal is to go free because the constable blundered." *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926). However, the end result of every police interaction with illegal behavior is not limited to securing a conviction. In some cases, using information provided by one person to build a case against another is the primary reward.

That is true in this case. Although Rush would escape conviction if the evidence seized from Wills's apartment was suppressed, that would not leave the officers bereft of a benefit from the search. As the result of finding crack cocaine in Rush's possession, the officers were able to discover considerable information about the source of that crack cocaine. Rush told them the name of his supplier, where he was from, how much he paid for the drugs, and how half of it was "fake." J.A. 136. Hours after the search, Rush went to the police station to identify his source. *Ibid.* If

this Court correctly concludes that the district court should have excluded the evidence recovered during the search against Rush, the police are not prevented from using the information he provided in further investigating or prosecuting his source. Therefore, the cost of suppression in this case is minimal, particularly when compared to the significant deterrent impact of suppression.

### G. Courts, including this one, dealing with similar cases have found exclusion to be appropriate when officers mislead citizens.

The district court's conclusion that exclusion is not appropriate in a case where police lie about the presence of a search warrant while conducting a search is at odds with the holdings of other courts. Those courts have consistently concluded that such deliberate and intentional misconduct requires suppression. That position is so consistent that, in a recent decision of this Court, discussion of whether suppression was appropriate was not even necessary.

In *United States v. Shaw*, 707 F.3d 666 (6th Cir. 2013), officers obtained an arrest warrant for a person who lived at 3171 Hendricks Avenue. They went to serve the warrant, but found only two different houses numbered 3170 on opposite sides of the street. An officer went to one house, knocked, and when someone answered the officer "represented to the woman that he had a warrant 'for this address.' False. He had a warrant for 3171 Hendricks, and this was 3170 Hendricks." *Id.* at 667. The woman let the officers in, who then "found a lot of cocaine." *Ibid.* Shaw moved to

suppress that cocaine after he was charged with various offenses related to it, but the motion was denied. *Ibid.*

Relying on *Bumper*, the Sixth Circuit reversed, noting that while there may be some circumstances in which a law enforcement ruse is appropriate, "none of this permits officers to tell an occupant that they have a warrant to make an arrest at a given address when they do not." *Shaw*, 707 F.3d at 669. In other words, police "may not falsely tell a homeowner that he has an arrest warrant for a house, then use that falsity as the basis for obtaining entry into the house." *Ibid.* In addition to finding the officers violated the Fourth Amendment, the court rejected the Government's argument that exclusion was not the proper remedy. "There may be good candidates for taking a stand on the exclusionary rule," the court wrote, "but this is not one of them." *Id.* at 670. It went on to conclude that "so long as there is an exclusionary rule, it seems safe to say it will apply to officers who enter and remain in a house based on false pretenses." *Ibid.*

The court reached the same conclusion in *United States v. Parson*, 599 F.Supp.2d 592 (W.D. Penn. 2009). In that case, two investigators who suspected Parson was in possession of child pornography went to his home. *Id.* at 594-597. One of the agents told Parson that "there was a chance he could be a victim of identity theft." *Id.* at 597. The agent then "asked if they could come in to discuss the identity theft situation." *Id.* at 598. Parson, who the agent described as "very cooperative," went to his computer to help with the identity theft problem. *Ibid.* At that point, the

discussion shifted to the subject of child pornography. Parson's computer and various storage media were seized, which were subsequently found to contain thousands of child pornography images. *Id.* at 599-600. The court concluded that the Government had failed to prove Parson validly consented to the agents' entry, due to the false statements about identity theft, but that "the question of remedy remains." *Id.* at 608. The court concluded that suppression was appropriate because "[t]his is not a matter of excusable neglect, simple mistakes, or mere negligent conduct." *Id.* at 611. Otherwise, "[a]llowing government agents to ignore laws while purporting to enforce them would steadily lead to the dissolution of the rule of law." *Id.* at 612. In such a case, the "facts . . . fall well within the Supreme Court's theory of exclusion as recently reiterated in *Herring.*" *Ibid*; see also, *United States v. Harrison*, 639 F.3d 1273, 1281 (10th Cir. 2011)(suppression appropriate where officers lied about anonymous tip that there was a bomb in defendant's home); *United States v. Harvey*, 901 F.Supp.2d 681, 696 (N.D. W.Va. 2012)(where consent to enter home was based on "mere acquiescence to a show of lawful authority," exclusion was required); *United States v. Stokely*, 733 F.Supp.2d 868 (E.D. Tenn. 2010)(adopting magistrate judge recommendation that evidence be suppressed when obtained following entry to home made after consent was coerced).

The propriety of the exclusionary rule in cases where consent is given only in the face of false statements by police is evident in this Court's recent decision of *United States v. Saafir*, 754 F.3d 262 (4th Cir. 2014). Saafir was pulled over in North

Carolina and ordered out of the car. *Id.* at 264-265. When Saafir got out of the car, the officer "noticed a hip flask commonly used to carry alcohol in the pocket of the driver side door." *Id.* at 265. The officer tried unsuccessfully to get Saafir to consent to a search of his car. Eventually, he told Saafir that he had probable cause to arrest him, based on the flask, for possession of "an alcoholic beverage other than in the unopened manufacture's original container." *Ibid.* Saafir acquiesced to a search based on the officer's claim of probable cause and a gun was found in the car. Saafir was convicted of being a felon in possession of a firearm after the district court denied his motion to suppress. *Ibid.*

On appeal, this Court reversed. The officer's assertion that he had probable cause to arrest Saafir because of the flask was incorrect. This Court held that assertion "was an independent, antecedent threat to violate the Fourth Amendment that ultimately fatally taints the search of the car and the seizure of the gun." *Saafir*, 754 F.3d at 266. That was because "the officer's false assertion of his authority to search the car irreparably tainted Saafir's incriminatory statements and the ensuing search of the car." *Ibid.* The principle that consent to search is "unreasonable and therefore unconstitutional if it is premised on a law enforcement officer's misstatement of his or her authority . . . stretches at least as far back as *Bumper*." *Ibid.* Notably, after reaching this conclusion, this Court did not even discuss whether exclusion was the proper remedy for the officer's Fourth Amendment violation. Rather, it "reversed the district court's order denying the suppression motion" and

remanded for further proceedings. *Id.* at 267. However, this Court "review[s] judgments, not reasons," *Yale v. National Indem. Co.*, 602 F.2d 642, 645 (4th Cir. 1979), and if the good-faith exception of *Herring* and its progeny applied, this Court could have affirmed the district court because the judgment – that the evidence should not have been suppressed – was correct. See also, *United States v. Smith*, 395 F.3d 516, 518-19 (4th Cir. 2005)("[w]e are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record"). That this Court did not do so speaks volumes of the appropriateness of suppression in cases where police make false claims of authority.

## CONCLUSION

Police officers arrived at the apartment where Rush was asleep, having been given consent to search by Wills, consent that Rush, as the sole present co-occupant, had the power to revoke. When he asked why they were there, the officers lied and told him they had a search warrant, effectively preventing him from revoking their consent to search. The officers' behavior was a deliberate and intentional violation of the Fourth Amendment based on long-standing principles set forth by the Supreme Court. It is precisely the kind of culpable behavior that the exclusionary rule is designed to deter. The district court erred by concluding that exclusion was not appropriate in this case. For that reason, this Court should reverse the district court and remand Rush's case with instructions to suppress the evidence gained as a result of the officers' deceit and dismiss the indictment against Rush.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure, Rush requests oral argument.  Given the nature of the issue presented and the impact this Court's decision will have on similar cases in the future, oral argument will aid the Court by providing it with the most developed basis for making its decision.

Date:  November 26, 2014.                    Respectfully submitted,

                                             **KENNETH RUSH**

                                             By Counsel

**CHRISTIAN M. CAPECE**
**FEDERAL PUBLIC DEFENDER**

**s/Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia  25301
E-mail:  jonathan_byrne@fd.org

**s/Rhett H. Johnson**
Rhett H. Johnson
Assistant Federal Public Defender
Office of the Federal Public Defender
Room 3400, US Courthouse
300 Virginia Street East
Charleston, West Virginia  25301
E-mail:  rhett_johnson@fd.org

# CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.      This brief complies with the type-volume limitation of F.R.A.P.  28.1(e)(2) or F.R.A.P. 32(a)(7)(B) because this brief contains **7,787** words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of F.R.A. P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared using Microsoft Word in 14 point Garamond.


**Date: November 26, 2014.**          **s/Jonathan D. Byrne**
                                       Appellate Counsel
                                       Office of the Federal Public Defender
                                       Room 3400, United States Courthouse
                                       300 Virginia Street East
                                       Charleston, West Virginia 25301
                                       Telephone: (304) 347-3350
                                       Facsimile: (304) 347-3356
                                       E-mail: jonathan_byrne@fd.org


                                       **s/Rhett H. Johnson**
                                       Assistant Federal Public Defender
                                       Office of the Federal Public Defender
                                       Room 3400, United States Courthouse
                                       300 Virginia Street East
                                       Charleston, West Virginia 25301
                                       Telephone: (304) 347-3350
                                       Facsimile: (304) 347-3356
                                       E-mail: rhett_johnson@fd.org

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on **November 26, 2014** the foregoing

**BRIEF** was electronically filed with the Clerk of Court using the CM/ECF System,

which will send notice of such filing to the following registered CM/ECF user:

> John J. Frail, AUSA
> Office of the United States Attorney
> 300 Virginia Street, East, Room 4000
> Charleston, WV 25301
> E-mail: john.frail@usdoj.gov

and served upon the Appellant by United States Mail, first class postage prepaid,

addressed as follows:

> Mr. Kenneth Rush
> 400 Upson Lane
> Atlanta, GA 30349

> By:     **s/Jonathan D. Byrne**
> Appellate Counsel
> Office of the Federal Public Defender
> Room 3400, United States Courthouse
> 300 Virginia Street East
> Charleston, West Virginia 25301
> Telephone: (304) 347-3350
> Facsimile: (304) 347-3356
> E-mail: jonathan_byrne@fd.org